# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **STEVE R. RIDDLE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06cv00100 |
| | ) | **MEMORANDUM OPINION** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,**[1] | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand this case to the Commissioner for further development consistent with this Memorandum Opinion.

## I.  Background and Standard of Review

Plaintiff, Steve R. Riddle, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this case pursuant to Federal Rule of Civil Procedure 25(d)(1).

Case 1:06-cv-00100-PMS   Document 16   Filed 06/21/07   Page 1 of 23   Pageid#: 67

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." '" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Riddle protectively filed his application for DIB on January 16, 2001, alleging disability as of October 8, 2000, based on back pain, left leg pain, headaches and incontinence. (Record, ("R."), at 56-59, 66, 76.) The claim was denied initially and upon reconsideration. (R. at 32-34, 37, 39-40.) Riddle then requested a hearing before an administrative law judge, ("ALJ"). (R. at 43.) The ALJ held a hearing on December 6, 2001, at which Riddle was represented by counsel. (R. at 193-248.) By decision dated February 13, 2002, the ALJ denied Riddle's claim. (R. at 11-23.) After the ALJ issued his decision, Riddle pursued his administrative appeals, (R. at 6), but the Appeals Council denied his request for review. (R. at 4-5.) Riddle then filed an action in this court seeking review of the ALJ's unfavorable decision, which, at that time, stood as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2006). By order dated July 17, 2003, this court remanded the case to the ALJ for application of the proper burden of proof, namely a preponderance of the evidence, in determining whether Riddle was disabled. (R. at 300.) A second hearing was held on April 14, 2004, at which Riddle again was represented by

counsel.[2]  (R. at 390-93.)

By decision dated November 30, 2004, the ALJ rendered a partially favorable decision, finding that, based on Riddle's having attained the status of "advanced age," the Medical-Vocational Guidelines, ("the Grids"), found at 20 C.F.R. Part 404, Subpart P, Appendix 2, directed a finding of disabled as of November 16, 2003, but not prior thereto.  (R. at 262-96.)  The ALJ found that Riddle met the disability insured status requirements of the Act for DIB purposes through the date of the decision.  (R. at 295.)  The ALJ found that Riddle had not engaged in substantial gainful activity since the alleged onset of disability.  (R. at 295.)  The ALJ also found that the medical evidence established that Riddle suffered from a severe impairments, namely degenerative disc and joint disease, obesity, depression and borderline intellectual functioning secondary to a learning disorder,  but he found that Riddle did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 267, 295.)  The ALJ found that Riddle's allegations regarding his pain and symptoms were not totally credible.  (R. at 295.)  The ALJ found that Riddle had the residual functional capacity to perform light[3] work diminished by an ability to only occasionally climb, balance, stoop, kneel, crouch and crawl.  (R. at 295.)  The ALJ further noted that Riddle was markedly limited in his ability to understand, remember and carry out detailed or complex instructions and moderately limited in his ability to maintain attention and

---

[2]Riddle opted not to testify at this hearing, instead allowing the ALJ to decide the case on the existing record before him.

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2006).

-3-

concentration for extended periods, to perform at a consistent pace, to respond appropriately to work pressures in a normal work setting and to respond appropriately to changes in a routine work setting. (R. at 295.) Thus, the ALJ found that Riddle could not perform his past relevant work. (R. at 295.) Based on Riddle's age at the time he filed his DIB application,[4] education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Riddle could perform, including those of a laundry worker, an office cleaner and a kitchen helper. (R. at 295-96.) Thus, the ALJ concluded that Riddle was not disabled under the Act and was not eligible for DIB benefits at any time prior to November 16, 2003. (R. at 296.) *See* 20 C.F.R. § 404.1520(g) (2006). However, the ALJ further noted that Riddle attained the status of "advanced age" under 20 C.F.R. § 404.1563(e) on November 16, 2003. (R. at 296.) Thus, based on Riddle's age, education, work history and residual functional capacity and the Grids, the ALJ found that Riddle was disabled as of November 16, 2003, and was entitled to benefits beginning on that date. (R. at 296.)

After the ALJ issued his decision, Riddle again pursued his administrative appeals, (R. at 253-55), but the Appeals Council denied his request for review. (R. at 249-52.) Riddle then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2006). The case is before this court on Riddle's motion for summary judgment filed March 2, 2007, and the Commissioner's motion for summary judgment

---

[4]The ALJ noted that, at the time Riddle filed his DIB application, he was an "individual closely approaching advanced age" under 20 C.F.R. § 404.1563(d). However, during the pendency of the proceedings before the Social Security Administration, on November 16, 2003, he attained the status of a person of "advanced age" under 20 C.F.R. § 404.1563(e).

Case 1:06-cv-00100-PMS   Document 16   Filed 06/21/07   Page 4 of 23   Pageid#: 70

filed March 28, 2007.

## *II. Facts and Analysis*

Riddle was born in 1949, (R. at 57), which classified him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d) at the time his filed his application. During the pendency of Riddle's claim, he attained the status of "advanced age" under 20 C.F.R. § 404.1563(e). Riddle has a tenth-grade education and past relevant work experience as a scoop operator in the coal mining industry. (R. at 67, 72.) Riddle testified that he hunted deer a total of approximately 10 hours in 2000 and a total of six to seven hours in 2001. (R. at 201.) He further testified that he fished some since his alleged onset date, and that he did this while alternating between mostly sitting and standing. (R. at 202-04.) Riddle stated that he used to hunt and fish weekly. (R. at 204.) He testified that he stopped working in October 2000 due to progressively worsening pain. (R. at 206.)

Riddle testified that he began experiencing depression prior to quitting work. (R. at 217-18.) He reported difficulty sleeping at night and low energy levels. (R. at 218.) He stated that he continued to see Dr. Forester, a psychiatrist, monthly. (R. at 220.) Riddle testified that his "nerves" had gotten better since he began taking medication. (R. at 212.) However, he testified that he could not concentrate and that he angered easily. (R. at 213.) He characterized his relationship with his family as "fair." (R. at 214.) He stated that his inability to work was due more to his back pain than his mental condition. (R. at 212.) Riddle stated that he sat in the house and watched television and sometimes listened to the radio. (R. at 214-15.) He stated that, with the exception of his son, whom he had visited twice in the previous two years,

Case 1:06-cv-00100-PMS   Document 16   Filed 06/21/07   Page 5 of 23   Pageid#: 71

he did not visit other family members. (R. at 215.) Riddle testified that he occasionally washed dishes. (R. at 216.) He stated that he had to dress himself by sitting on the bed due to an inability to lift his left leg high enough. (R. at 216-17.)

Jerome Nichols, a psychological expert, also was present and testified at Riddle's hearing. (R. at 221-28, 234-46.) Nichols opined that Riddle suffered from a nonsevere affective disorder. (R. at 223-24.) He further opined that Riddle's mental impairment did not meet or equal a listed impairment. (R. at 224.) Nichols completed a mental assessment of Riddle during the hearing, in which he found that Riddle was markedly limited in one area of mental functioning, moderately limited in four areas of mental functioning and only mildly limited in the remaining 10 areas of mental functioning. (R. at 181-83.) Nichols opined that a diagnosis of mental retardation was not proper. (R. at 225.) However, he opined that Riddle suffered from a learning disorder. (R. at 225.) He stated that Riddle functioned in the borderline range of intelligence, which he attributed to the learning disorder and the possibility of some reduction in functioning due to depression. (R. at 226.) Nichols noted that psychologist Ramsden's interpretation of Riddle's Personality Assessment Inventory, ("PAI"), as indicating extremely poor self-perception versus malingering or exaggeration of symptoms, was a "very unusual interpretation," and Nichols opined that the results did, in his opinion, likely invalidate the findings. (R. at 226-27.) He further opined that Riddle was not as limited as set forth in Dr. Forester's assessment. (R. at 235.) Nichols stated that he did not believe that Riddle was as depressed as did Dr. Forester. (R. at 235.) However, he attributed this merely to a difference of professional opinion. (R. at 227-28, 235.) Nichols further stated that his professional opinion differed from that of psychologist Ramsden. (R. at 227, 236.) Nichols stated

-6-

that, in rendering his assessment of Riddle, he focused primarily on Riddle's mental disorder, not on the effect his pain might have on his work-related mental abilities. (R. at 237.) Nichols testified that, in completing his mental assessment of Riddle, he took into account Riddle's history, his testimony, his behavior during the hearing and the fact that there had been a history of exaggeration of symptoms. (R. at 227, 236.)

Jean Hambrick, a vocational expert, also was present and testified at Riddle's hearing. (R. at 228-34.) Hambrick classified Riddle's past work as an underground coal miner as at least heavy[5] and unskilled and his work as a scoop operator as heavy and semiskilled. (R. at 229-30.) Hambrick testified that none of Riddle's skills were transferable to work outside of the coal mining industry. (R. at 230.) Hambrick was asked to assume a hypothetical individual of Riddle's age, education and past work experience who could perform medium work diminished by an ability to occasionally climb, balance, stoop, kneel, crouch and crawl and who was moderately limited in his ability to maintain attention and concentration for extended periods, to perform at a consistent pace, to respond appropriately to work pressures in a normal work setting and to respond appropriately to changes in a routine work setting and who was markedly limited in his ability to understand, remember and carry out detailed or complex job instructions. (R. at 230.) Hambrick testified that such an individual could perform jobs at the light[6] level of exertion that existed in significant numbers

---

[5]Heavy work involves lifting objects weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2006).

[6]Light work involves lifting objects weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2006).

in the national economy, including the jobs of a laundry worker, an office cleaner and a kitchen helper. (R. at 231.) Hambrick was next asked to consider a hypothetical individual with the same exertional limitations, but who had a seriously limited, but not precluded, ability to follow work rules, to use judgment, to maintain attention and concentration, to perform detailed but not complex job instructions and to perform simple job instructions and who had a poor or no ability to relate to co-workers, to deal with the public, to interact with supervisors, to deal with work stresses, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 232.) Hambrick testified that such an individual would not be able to perform any jobs. (R. at 232.)

Next Hambrick was asked to consider a hypothetical individual with the same exertional limitations, but who had a fair ability to relate to co-workers, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out detailed but not complex job instructions, to relate predictably in social situations and to demonstrate reliability and a poor or no ability to deal with the public, to use judgment, to deal with work stresses, to understand, remember and carry out complex job instructions and to behave in an emotionally stable manner. (R. at 232.) Hambrick testified that there would not be any jobs that the individual could perform. (R. at 232.) Finally, Hambrick testified that an individual with the mental limitations set forth in Dr. Schultz's assessment, dated April 25, 2001, would not be able to work. (R. at 233.)

In rendering his decision, the ALJ reviewed records from Dr. Harold E. Schultz,

D.O.; Dr. Jim C. Brasfield, M.D.; Dr. Sujata Gutti, M.D.; Dr. David L. Forester, M.D., a psychiatrist; Dr. Sai P. Gutti, M.D.; Pikeville United Methodist Hospital; R.J. Milan Jr., Ph.D., a state agency psychologist; Hugh Tenison, Ph.D., a state agency psychologist; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Donald R. Williams, M.D., a state agency physician; Dr. William Lester, M.D.; Ralph Ramsden, Ph.D., a licensed clinical psychologist; Jerome Nichols, a psychological expert; Dr. J.P. Sutherland Jr., D.O.; Dr. Frank J. Sutherland, D.O.; Gary T. Bennett, Ph.D., a licensed clinical psychologist; and Dr. Muhammad R. Javed, M.D.

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2006).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in

the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

In a decision dated November 30, 2004, the ALJ found that, prior to November 16, 2003, Riddle retained the physical residual functional capacity to perform a diminished range of light work that would allow for the performance of jobs existing in significant numbers in the national economy. (R. at 295-96.) In his brief, Riddle argues that the ALJ erred in his physical residual functional capacity finding. (Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 10-12.) Riddle also argues that the ALJ erred by failing to find that he suffered from a disabling mental impairment. (Plaintiff's Brief at 12-19.)

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907

-10-

F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

In his decision, the ALJ found that, prior to November 16, 2003, Riddle retained the physical functional capacity to perform light work with an occasional ability to climb, to balance, to stoop, to kneel, to crouch and to crawl. (R. at 295.) For the reasons that follow, I find that this finding is not supported by substantial evidence. The record reveals that in September 2000, Dr. Frank J. Sutherland, D.O., diagnosed Riddle with cervical radiculitis, spinal stenosis, carpal tunnel syndrome and hypertension. (R. at 144.) MRIs and x-rays showed herniated discs in both the cervical and lumbar spine and bilateral degenerative facet disease. (R. at 86-87, 96-97.) In October 2000, Dr. Harold E. Schultz, D.O., opined that Riddle was unable to work pending further evaluation by a neurologist. (R. at 139.) Later that month, Dr. Jim C. Brasfield, M.D., a neurologist, diagnosed Riddle with chronic cervical spondylosis, bilateral carpal tunnel syndrome by history and hypertension. (R. at 91, 99-100.) Dr. Brasfield advised Riddle to remain off work. (R. at 91, 100.) Cervical and lumbar myelography and a nuclear bone scan performed on November 8, 2000, by Dr. Sujata Gutti, M.D., indicated left lower lumbar radiculopathy. (R. at 88-90.) On November 29, 2000, Riddle exhibited a limited range of motion of the cervical and lumbar spine. (R. at 85.) Dr. Sujata Gutti diagnosed lumbar radiculopathy and cervical strain and recommended that he be evaluated at a pain clinic. (R. at 85.) Dr.

-11-

Sujata Gutti advised Riddle to remain off work.  (R. at 85.)

On December 8, 2000, Riddle saw Dr. Sai P. Gutti, M.D., for pain management. (R. at 366-68.)  Although he exhibited full strength in the upper and lower extremities, his sensation was decreased in both the left upper and left lower extremities.  (R. at 367.)  On December 29, 2000, Riddle underwent a lumbar epidural steroid block, a bilateral SI joint injection and a bilateral lumbar facet joint injection.  (R. at 103-05.) He was diagnosed with chronic lower back pain, intermittent paresthesias, bilateral facet syndrome and lumbar spondylosis.  (R. at 104.)  On January 10, 2001, Dr. Sai Gutti noted that these injections had resulted in significant improvement.  (R. at 365.) Riddle was diagnosed with chronic lower back pain and left lower extremity radiculopathy and was treated with medications.  (R. at 365.)

On March 5, 2001, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a physical assessment, finding that Riddle could perform medium work with an occasional ability to climb, to balance, to stoop, to kneel, to crouch and to crawl.  (R. at 120-27.)  These findings were affirmed by Dr. Donald R. Williams, M.D, another state agency physician.  (R. at 127.)

On April 25, 2001, Dr. Schultz completed a physical assessment, finding that Riddle could both occasionally and frequently lift items weighing up to only 12 pounds.  (R. at 128-30.)  He found that Riddle could stand/walk for a total of up to two hours in an eight-hour workday, but for only 30 minutes without interruption, and that he could sit for a total of three hours in an eight-hour workday, but for only 30 minutes without interruption.  (R. at 129.)  Dr. Schultz found that Riddle could never

-12-

climb, stoop, crouch or crawl, and that he could occasionally kneel and balance. (R. at 129.) He noted that Riddle's abilities to reach, to push/pull, to see and to speak were affected by his impairments and that he could not work around heights, moving machinery, temperature extremes, chemicals, noise, fumes, humidity and vibration. (R. at 129-30.) Dr. Schultz opined that Riddle would miss more than two workdays monthly. (R. at 130.)

On May 11, 2001, Riddle was unable to heel walk due to pain on the left. (R. at 187.) Flexion of the spine was limited to approximately 25 degrees. (R. at 187.) Dr. William Lester, M.D., diagnosed lumbar radiculopathy and prescribed medication. (R. at 187.) On August 17, 2001, and again on November 19, 2001, Riddle reported doing well with somewhat improved back pain. (R. at 184-85.) Dr. Lester diagnosed chronic low back pain, well-managed with medication. (R. at 184.) On December 17, 2001, Dr. Lester completed a physical assessment, finding that Riddle could perform light work diminished by an ability to stand/walk for a total of only two hours in an eight-hour workday, an inability to climb and an occasional ability to stoop, to kneel and to balance. (R. at 190-92.) Dr. Lester further found that Riddle's ability to reach, to handle and to push/pull were affected by his impairments and that he should not work around heights or moving machinery. (R. at 192.) Like Dr. Schultz, Dr. Lester opined that Riddle would miss more than two workdays monthly. (R. at 192.)

On September 26, 2002, Dr. J.P. Sutherland Jr., D.O., noted that Riddle had severe restriction of range of motion of the musculoskeletal system associated with his neck and low back. (R. at 345-46.) He noted the MRI findings showing the presence of degenerative disc disease. (R. at 345.) Dr. Sutherland opined that Riddle

-13-

could not lift, bend, stoop, turn, twist, stoop or squat and that he was limited to lifting items weighing up to 20 pounds on a one-time basis.  (R. at 345.)  He opined that Riddle would have difficulty sitting for more than 30 minutes without recurrent neuralgia and numbness of the legs.  (R. at 345.)  Dr. Sutherland diagnosed chronic pain syndrome and opined a poor prognosis for Riddle ever doing gainful employment.  (R. at 346.)

On August 18, 2003, Dr. J. P. Sutherland noted decreased range of motion of the lumbar spine with lifting, bending, stooping and squatting.  (R. at 371.)  He diagnosed degenerative arthritis of the lumbar spine, neuralgia of the left leg, bilateral sciatica, lumbar myositis and chronic pain syndrome.  (R. at 371.)  He administered a Decadron injection and advised Riddle against lifting, bending, stooping and squatting.  (R. at 371.)  On October 20, 2003, Dr. J. P. Sutherland again noted decreased range of motion of the lumbar spine.  (R. at 370.)  Riddle's diagnoses remained unchanged, and Dr. Sutherland administered another Decadron injection. (R. at 370.)

There are treatment notes from Dr. Muhammad R. Javed, M.D., also contained in the record.  However, because these records post-date the date on which the ALJ found that Riddle's disability began, they are irrelevant to the claim currently before the court and will not be discussed in this Memorandum Opinion.

In arriving at his physical residual functional capacity finding, the ALJ gave

very little weight to the assessments of Dr. Schultz and Dr. J. P. Sutherland.[7] (R. at 275, 283-84.) He gave some weight to the assessment of Dr. Lester, but he gave more weight to the opinions of the state agency physicians. (R. at 276.) I find that substantial evidence does not support the ALJ's weighing of the evidence and resulting physical residual functional capacity finding. I first note that although Dr. Schultz, Dr. Lester and Dr. J. P. Sutherland all imposed restrictions on Riddle's abilities to sit and to stand/walk, the ALJ included no sit/stand option, nor did he note any such limitation, in his physical residual functional capacity finding. Likewise, the ALJ found that Riddle had an occasional ability to climb, to balance, to stoop, to kneel, to crouch and to crawl, despite Dr. Schultz's finding that Riddle could *never* climb, stoop, crouch or crawl, Dr. Lester's finding that Riddle could *never* climb and Dr. J. P. Sutherland's finding that Riddle could *never* bend, stoop or squat. (R. at 280.) While the ALJ may accept the opinion of a nontreating physician over that of a treating physician, he may do so only if the opinion of the treating physician "is not supported by the clinical evidence or if it is inconsistent with other substantial evidence." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). For the following reasons, I find that is not the case here.

The objective evidence in the record, including x-rays and MRIs, show severe musculoskeletal impairments, including herniated discs in both the cervical and lumbar spine and bilateral degenerative facet disease that would justify the imposition of such postural limitations. (R. at 86-87, 96-97.) I further note that the assessment completed by Dr. Surrusco, the state agency physician, was dated March 5, 2001, and

---

[7]The ALJ also gave very little weight to the opinion of Dr. Javed, but as already noted, Dr. Javed's findings are not relevant to the claim currently before the court.

did not take into consideration any medical records after February 21, 2001, including Dr. Schultz's April 25, 2001, physical assessment, any of Dr. Lester's treatment notes, including a physical assessment dated December 17, 2001, and Dr. J. P. Sutherland's treatment notes through February 2004. Records from these treating sources are quite relevant in determining whether Riddle was disabled prior to November 16, 2003.

Further, I note that the ALJ placed great emphasis on Riddle's activities of daily living, including hunting, fishing and driving and/or riding in a vehicle. Riddle testified that while he used to hunt and fish weekly, he no longer was able to do so. (R. at 204.) He testified that he hunted for a total of approximately only 10 hours during the entire 2000 deer hunting season, following his alleged onset date of disability. (R. at 201.) Riddle testified that he hunted approximately only six to seven hours with a crossbow during the 2001 hunting season. (R. at 201.) He stated that when he hunted, he drove his vehicle to the spot from which he hunted. (R. at 202.) Riddle further testified that he did not have to use his arm to pull back the crossbow because it had a "crank" on it. (R. at 205.) He stated that he killed a deer in 2000, but that his son dragged it out of the woods for him. (R. at 205.) Riddle also testified that he fished twice in North Carolina after his alleged onset date, all while alternating between sitting and standing, for approximately six hours each time. (R. at 202-03.) He stated that he shared the driving time to North Carolina with his wife, but had to make frequent stops. (R. at 204.)

I find that such minimal physical activities are not inconsistent with an individual with significant postural limitations as imposed by Drs. Schultz, Lester and J. P. Sutherland. I further find that, as noted above, these postural limitations are

supported by the objective evidence contained in the record.  For these reasons, I find that substantial evidence does not support the ALJ's weighing of the evidence regarding Riddle's work-related physical abilities and his resulting physical residual functional capacity finding.

Riddle also argues that the ALJ erred by failing to find that he suffered from a disabling mental disorder prior to November 16, 2003.  (Plaintiff's Brief at 12-19.) For the following reasons, I agree.  In September 2000, Dr. J. P. Sutherland diagnosed Riddle with underlying depression.  (R. at 144.)  On October 31, 2000, Dr. David L. Forester, M.D., a psychiatrist, completed a psychiatric evaluation, diagnosing Riddle with generalized anxiety disorder.  (R. at 153.)  He noted that Riddle's mood was depressed and his affect was constricted.  (R. at 153.)  Riddle's thought process was goal-directed, and his recent and remote memory was intact.  (R. at 153.)  On November 28, 2000, Riddle again was diagnosed with generalized anxiety disorder and major depression.  (R. at 152.)  Dr. Forester prescribed Prozac.  (R. at 152.)  The following month, Dr. Sai Gutti noted that Riddle was moderately depressed.  (R. at 367.)  She further noted that Riddle's recent and remote memory was intact and that he had normal concentration.  (R. at 367.)  On January 8, 2001, Riddle again was diagnosed with major depression and generalized anxiety disorder.  (R. at 151.)  On March 5, 2001, R.J. Milan Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Riddle suffered from a nonsevere affective disorder.  (R. at 106-19.)  Milan found Riddle's mental allegations only partially credible.  (R. at 118.)  This assessment was affirmed by Hugh Tenison, Ph.D., another state agency psychologist, on March 5, 2001.  (R. at 106.)  On April 30, 2001, Dr. Forester increased Riddle's dosage of Prozac.  (R. at

-17-

149-50.)  He again was diagnosed with major depression.  (R. at 149.)  On May 29, 2001, Dr. Forester prescribed Sonata.  (R. at 155.)

On June 18, 2001, Riddle saw Ralph Ramsden, Ph.D., a licensed clinical psychologist, at the request of his attorney.  (R. at 158-64.)  He reported crying spells and mood swings, nervousness, excessive worry, memory and concentration problems and restlessness.  (R. at 159.)  Ramsden administered the Wechsler Adult Intelligence Scale-Third Revision, ("WAIS-III"), test, on which Riddle achieved a verbal IQ score of 72, a performance IQ score of 73 and a full-scale IQ score of 70, placing him in the borderline range of intellectual functioning.  (R. at 162.)  Ramsden also administered the Kaufman Functional Academic Skills Test, ("K-FAST"), which also indicated that Riddle was functioning in the borderline range of intelligence.  (R. at 162.)  Lastly, Ramsden administered the PAI, which was characterized by strong negative impressions indicating an intent to portray oneself in an especially negative manner.  (R. at 162.)  However, Ramsden attributed this not to malingering, but to an extremely poor self-perception.  (R. at 162.)  Riddle's profile was noted for elevations of depression, anxiety, a possible thought disorder, poorly-managed stress and somatic complaints.  (R. at 163.)  Ramsden noted that decisionmaking was difficult for Riddle and that his short-term memory was compromised.  (R. at 163.)  Ramsden diagnosed major depressive disorder, single episode, severe, without psychotic features, adjustment disorder with mixed disturbance of emotions and conduct, borderline intellectual functioning and a then-current Global Assessment of Functioning, ("GAF"), score of 45.[8]  (R. at 164.)

---

[8]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32

Riddle continued to see Dr. Forester on June 26, 2001, at which time he was again diagnosed with generalized anxiety disorder and major depression. (R. at 171.) He was prescribed Sonata and Prozac. (R. at 171.) On June 27, 2001, Ramsden completed a mental assessment of Riddle, finding that he had a good ability to follow work rules, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 165-67.) He found that Riddle had a fair ability to relate to co-workers, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out detailed, but not complex, job instructions, to relate predictably in social situations and to demonstrate reliability. (R. at 165-66.) Ramsden found that Riddle had a poor or no ability to deal with the public, to use judgment, to deal with work stresses, to understand, remember and carry out complex job instructions and to behave in an emotionally stable manner. (R. at 165-66.)

On October 26, 2001, Riddle reported an improvement in his mood, but persistent anxiety. (R. at 168.) He was again diagnosed with major depression. (R. at 168.) Dr. Forester prescribed BuSpar in addition to Prozac. (R. at 168-69.) Dr. Forester completed a mental evaluation on October 29, 2001, indicating that Riddle displayed a somewhat constricted, but anxious affect. (R. at 172-77.) He noted no evidence of a formal thought disorder. (R. at 176.) Dr. Forester diagnosed Riddle with major depressive episode with associated anxious features and generalized anxiety disorder. (R. at 177.) Dr. Forester opined that Riddle's participation in his psychiatric treatment plan had stabilized his condition and prevented decompensation,

(American Psychiatric Association 1994). A GAF of 41 to 50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning. ..." DSM-IV at 32.

-19-

but that further psychiatric treatment was indicated. (R. at 177.) However, Dr. Forester opined that ongoing psychiatric treatment would not result in complete resolution of Riddle's emotional difficulties. (R. at 177.)

On November 13, 2001, Dr. Forester completed another mental assessment, finding that Riddle had a good ability to function independently and to maintain personal appearance, a fair ability to follow work rules, to use judgment, to maintain attention and concentration and to understand, remember and carry out detailed and simple job instructions. (R. at 178-80.) He found that Riddle had a poor or no ability to relate to co-workers, to deal with the public, to interact with supervisors, to deal with work stresses, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 178-79.)

On December 6, 2001, the day of Riddle's hearing, Nichols, the psychological expert, completed a mental assessment, finding that Riddle was moderately limited in his ability to maintain attention and concentration for extended periods, to perform at a consistent pace, to respond appropriately to work pressures in a normal work setting and to respond appropriately to changes in a routine work setting. (R. at 181-83.) He found that Riddle was markedly limited in his ability to understand, remember and carry out complex job instructions. (R. at 181.) In all other areas of mental functioning, Nichols found that Riddle was only mildly limited. (R. at 181-82.)

Riddle continued to see Dr. Forester on January 4, 2002, when he was again diagnosed with major depression. (R. at 355.) He noted that Prozac helped lessen his

symptoms. (R. at 355.) However, on April 22, 2002, Riddle stated that he was more depressed because he was in more pain. (R. at 354.) On July 5, 2002, Riddle reported that he stayed depressed all of the time. (R. at 353.) He was prescribed Xanax. (R. at 353.) On August 20, 2002, Riddle reported that Xanax helped his condition. (R. at 352.) Dr. Forester noted that Riddle's major depression and generalized anxiety disorder were under fair control. (R. at 352.) He was diagnosed with generalized anxiety disorder and major depression. (R. at 352.) His condition remained unchanged through February 3, 2004. (R. at 348-51, 372-74.)

There are treatment notes from Gary T. Bennett, Ph.D., a licensed clinical psychologist, dated December 17, 2003, also contained in the record. However, because these records post-date the date on which the ALJ found that Riddle's disability began, they are irrelevant to the claim currently before the court and will not be discussed in this Memorandum Opinion.

The ALJ rejected the opinions of Riddle's treating psychologists and psychiatrists in favor of that of Nichols, the psychological expert. However, for the reasons discussed below, I find that substantial evidence does not support the ALJ's weighing of the evidence. As mentioned previously, while the ALJ may accept the opinion of a nontreating physician over that of a treating physician, he may do so only if the opinion of the treating physician "is not supported by the clinical evidence or if it is inconsistent with other substantial evidence." *Craig*, 76 F.3d at 590. That is not the case here. In fact, I find that the opinions of Dr. Forester and Ramsden, treating mental health sources, are not inconsistent with other substantial evidence of record. Ramsden administered objective testing as part of his psychological

evaluation of Riddle in June 2001. This testing revealed that Riddle was functioning in the borderline range of intelligence. (R. at 162.) Although the results of the PAI administered by Ramsden could be indicative of malingering, Ramsden instead attributed these results to Riddle's extremely poor self-perception. (R. at 162.) Nichols opined that the results were likely invalid as suggesting malingering, but he further noted that this likely constituted nothing more than a difference of professional opinion. In October 2001, Dr. Forester, who began treating Riddle in October 2000, opined that although Riddle's participation in his psychiatric treatment plan had stabilized his condition and prevented decompensation, Riddle needed further treatment and that his condition would likely never fully resolve. (R. at 177.) Ramsden conducted objective mental testing and both he and Dr. Forester saw Riddle personally, observed his behavior and memorialized their findings and observations in writing. On the other hand, although Nichols testified that he based his opinion, among other things, on his observation of Riddle at the hearing he did not describe Riddle's behavior, nor did he explain why such behavior led to his findings with regard to Riddle's mental limitations. Thus, as Riddle notes in his brief, the court cannot now review that information or determine whether the ALJ's reliance thereon is supported by substantial evidence. Furthermore, as Riddle notes in his brief, although the ALJ stated that Nichols opined that Riddle's level of achievement was below that expected of his actual abilities, Nichols actually stated that Riddle was suffering from a learning disability and/or that the reduced achievement level was attributable to his depression. (R. at 225-26.) Finally, while the ALJ stated that Nichols disagreed with the limitations assessed by Dr. Forester, he failed to note that Nichols further stated that this was a mere difference of professional opinion and that Nichols stated no objective reason for this disagreement. (R. at 228.) Thus, as Riddle

-22-

contends, the ALJ appears to have misconstrued some of Nichols's testimony in his decision.

For all of these reasons, I find that substantial evidence does not support the ALJ's weighing of the evidence with regard to Riddle's work-related mental abilities and his resulting mental residual functional capacity finding.

## IV. Conclusion

For the foregoing reasons, Riddle's motion for summary judgment and the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated, and the case will be remanded to the Commissioner for further consideration of Riddle's physical and mental residual functional capacities and his ability to perform work-related activities.

An appropriate order will be entered.

DATED:    This 21ˢᵗ day of June 2007.

/s/  *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

-23-